Thank you, Your Honor. May it please the Court, I'm Jerry Falk for the Appellant Pacific Maritime Association. I'd like to reserve five minutes for reply, if I may. Try to keep track and I'll try to help. I'm watching. Click away. In personal terms, this is a very sad case, but sympathy, or dare I use the word empathy, for a dying colleague and his family did not justify what happened here. This plan was set up without corporate authority by officers of PMA. And in 2002, again without board authority or knowledge, the CEO, Mr. Miniace, worked with his terminally ill CFO, Mr. McMahon, to amend the plan to strip PMA of $9 million of benefits under the plan as created. Those benefits came under a key person or key man insurance, term insurance policy that was a part of the original plan, and not coincidentally, because the tax structure and the tax advantages sought by the framers of the plan required PMA and not the individual employee. Did the district court make a finding that that was the purpose of the plan? Well, no. The district court made a finding that the tax purposes required it. And there can't be any doubt about it. I mean, this doesn't work. But key person insurance was not the ultimate focus of the plan. Well, the district court did make that finding, Judge Pius. When you talk about the purposes, you have to – it seems to me that you have to – Well, no. You just started off by emphasizing that this was key person insurance. Well, the plan says it is. The plan itself – That was just kind of – what I got from the district court's ruling, that that was sort of – in order to enjoy the tax benefits, they had to structure it, at least to start with, to have that insurance policy. Right. Well, if you – But that wasn't the – I mean, there was other – it was designed ultimately to present or to preserve or to provide supplemental retirement insurance. Well, first of all, if we are talking about the intent, someone's intent, the only intent that could have existed here was the intent of a handful of officers who, in breach of fiduciary duties, as the district court found, set this plan up without the approval of the board. The company, the board, had no intent one way or the other. It didn't know about it. But the – and the controlling document is the plan, and the plan characterizes this as key man insurance. And it had to be, or else it didn't work. The reason it had to be is that the whole scheme required payment of more dollars into the plan each year than the actual premiums on the insurance portion of it, so that equity would build up in the ordinary life policy. That's why there was a big term policy in addition to the ordinary life policy. So it had to be. It didn't work without it. And it would be a – it wouldn't work as a tax scheme if the employee were the beneficiary. And it wouldn't work as it would be tax fraud if there was a wink, wink, nudge, nudge understanding that at the end of the day, the employee really would be the beneficiary. Let me – there's one thing I want to make sure I understand. After this fellow, the CFO, was diagnosed with pancreatic cancer, and they made – they made that change in the plan, If that change had not been made, and if he had just normally retired and left the corporation, what would the benefits – what would have ensued? Well, the record shows that in the case of healthy employees who retired, they – one of two things happened. Either eventually, after the prepaid term expired, they would have the opportunity to take over the term insurance and pay the premiums themselves, or if they didn't want that, then the term policy would be changed. And how much would PMA benefit in that situation? They wouldn't benefit from the term policy at all in either of those instances. But if an employee died at his desk, which is the functional equivalent of what happened here, then PMA would get the term policy – the proceeds. And that's the critical difference between what happened with a few other employees and what happened here. A term policy, as a matter of economics, has no value other than the remaining premium for that, say, a one-year term. This policy had nine months to go, so there was some tens of thousands of dollars of, I think, prepaid premium. That's the only value a term policy has for a healthy employee. It was still insurable. When Mr. McMahon was diagnosed with pancreatic cancer, which is unfortunately a death sentence, that policy became enormously valuable. It was a matter of weeks, predictably, before it turned into a benefit. And so at that point – Well, counsel, I have a question with respect. You know, it seems to me that your argument appears to be almost entirely based or characterized as your contractual rights under the SEBP. But this case was brought in equity. So can you offer any other reasons why it would be unjust – I'm speaking in equitable terms – for the widow to retain her late husband's death penance? Yes, Judge Nelson. We have cited in the briefs a number of principles of equity that apply quite precisely to this circumstance. The restatement gives examples of a fiduciary who, in breach of fiduciary duty, purchases with the funds that don't belong to him a policy of life insurance or goes to the racetrack and makes a bet and either wins the bet or dies and the policy pays off. As a matter of standard principles of equity, as the restatement recognizes, the proceeds of the bet or the proceeds of the life insurance policy are subject to a constructive trust in favor of the party whose money paid for the bet or the premium. Yes, but the widow had nothing to do with that, quote, breach of fiduciary duty. Between the widow and the PMA, I guess, why is it unjust when we go back to why this was set up? It was set up for tax purposes, but was set up with the idea that they would all get greater benefits, untaxable benefits, by setting up this plan. The widow had nothing to do with that side agreement at all and we're asking in equity why it would be unjust for her to have the proceeds as opposed to the PMA, which was really set up for the purpose of avoiding taxes and giving them greater return when there was a debt. Judge Nelson, there are, I think, two points in response. First, under the restatement authority and the cases it's based on that I alluded to, when you have an insurance policy that pays off, by definition, it's somebody else. So in the very example given in the restatement of a fiduciary who in breach of fiduciary duty buys a life insurance policy on his life and dies, then it's the widow or the children or whoever who is innocent of the wrongdoing who would be getting proceeds that are then subjected to a constructive trust. So under standard principles of equity, the innocence of the beneficiary is not a significant relevant factor. Constructive trusts are put on innocent parties, as I gave an example in our brief of someone who inherits stolen art, and constructive trusts are put on that as a matter of routine. So this is just another example of a standard principle of equity being applied to these facts. With respect to the purposes of the plan, the plan, again, it's the purposes of people who were acting in breach of their fiduciary duty from day one, but their purpose- Excuse me. Let me interrupt there. Not from day one. The breach of fiduciary duty is found by the lower court was when it was amended. Isn't that correct? No, it's not correct. The breach of fiduciary duty before that time. No, that's not correct, Judge Nelson. Judge Ilston found that the plan was set up in breach of fiduciary duty without the knowledge of the board and amended. She also said that the board was just careless and not attending to its duties to supervise the key officials. She found that the board was negligent. She found that the greater fault- Pretty clear about that. She really chastises the board. Well, she also, in the attorney's view, found that the fiduciaries had the greater fault, but the board's negligence that she found had to do with the initial setting up of the plan. She did not find, and there would be no evidence to find, that the board was negligent in failing to discover the amendment. That happened very quickly, and they had no contact with it whatsoever. So the amendment that stripped the company of a $9 million benefit was not done with any negligence. I'm taking you past the time you wanted to reserve, but we'll make sure you get a chance to respond, so don't be too concerned. As I read Judge Ilston's order, she does indeed find that there was a breach of fiduciary duty initially in setting up the plan and then, second, in amending the plan. Correct. Now, we know from the record what happened to a fair number of these executives who were beneficiaries under the plan, who did not die prematurely, who did retire and so on, but they're benefiting from a plan, as Judge Ilston found, that was established in breach of fiduciary duty. Now, under your reasoning, it sounds as though that's unjust enrichment to them, too. Isn't that right? No. Why not? Because that plan was set up in breach of fiduciary duty, and because it was set up in breach of fiduciary duty, they're benefiting from a plan that never should have been set up. The money by PMA never should have been paid for that. So why is that case one in which there's no unjust enrichment for the people who do not die prematurely but rather take the plan as a retirement plan? Well, I think there are two answers to it. One is that's not a claim my client chose to assert. Yeah, but I'm trying to figure out what's unjust, because if that's unjust and your client chooses not to go after that, that gives me some sense as to what might be considered unjust by your client or an outsider might consider unjust. Well, the first answer is they haven't asserted it. The second answer is that in the case of the other employees, they did not receive, in most cases, proceeds. Well, nobody has died. There are no proceeds of term life insurance involved. And thirdly... But they're getting a pretty good deal. They got a very large benefit. I quite agree with you. The other thing is, though, that the original setting up of this plan back in 1996, as I recall, was itself not a violation of ERISA. So that would have been a state law matter. It's a matter of some interest but not legal consequence here that the plan was initially set up in violation of fiduciary duties. That itself is not an ERISA claim. The ERISA claim is the claim that arises out of the 2002 amendment, which stripped the company of a benefit to which it was entitled under ERISA, under the plan, without authority and in violation of fiduciary duties. That's the ERISA claim here. But the other thing, if I could just finish answering your question. I'm sorry to step on your word, but I don't think I've quite answered the question. The critical difference here is that in this instance, in the case of the other employees, they either canceled the term policy, which was fine with PMA and doesn't raise any issues for PMA, or they took over the premiums. If an employee who retires and is healthy takes over the premium, then it's entirely equitable for that employee to retain, or his estate to retain or beneficiary to retain the proceeds at such time in the future that the employee passes away after a term that the employee paid for. Here, there were nine months to go on this policy when Mr. McMahon became ill. At that point, it was a $10 million asset that entirely belonged to the company. And that was stripped of them, stripped of it by a breach of fiduciary duty. So it is different in principle and on the facts from the other employee cases. Mr. Faulkner, before you sit down, let me just ask, and I'm sure Judge Fletcher will accommodate you in some rebuttal time. I just have a very short question. I understand your argument. It's that Judge Elston abused her discretion in awarding, in not awarding the funds to PMA. Yes. Is that correct? You don't claim that she made any legal errors in her analysis. No, no, no. Because a legal error can warrant an abuse of discretion. No, I do claim that. So where is the legal error? The legal error was failing to apply established rules of equity. The point we make in our brief is that ---- Well, she looks like she does, as Judge Nelson pointed out, that, you know, she looks like she does an equity analysis. But she applies ---- We cited in our, I think in our opening brief, a U.S. Supreme Court decision that makes reference to Selden's famous comment that equitable principles are not simply measured by the length of the Chancellor's foot. Rules of equity exist and have to be applied by a court sitting in equity and exercising equitable powers. And I hate to say that Judge Ilston, who I admire as much as anybody, abused her discretion. But I think she got the law wrong. We say it all the time. I know, but it's easier for you. It's easier for you than me. I just get upset with it, so don't worry. But I believe she got the law wrong, law or the equity. She got the law of equity wrong. That's right. And it's those principles from the restatement that we cited in our brief that I believe she got wrong. Okay. But let me, and again, don't worry about the time. I mean, there's some tricky things in this case, and I want to make sure that we've explored them as best we can. Judge Ilston talks about, well, the intent of the plan was. And your brief doesn't like her use of the term intent attributable to the corporation in general. You're saying, well, it was the intent of particular officers who were in breach of their fiduciary duty, but it certainly wasn't the intent of the association because it was never approved by the board and so on. But, of course, intent is a really tricky term when applied to entities made up of multiple people and when various decisions are made by various people and there may be tacit arrangements that don't quite accord with the rules and so on. And it's pretty clear that at the time that, I don't know how PMA is operating now, but it was pretty clear at the time that PMA was operating, there were a lot of things they didn't take to the board, maybe on purpose. There were a lot of things that the board didn't write down, maybe on purpose. So it wasn't something where you've got a board punctiliously observing all of the niceties and the requirements and so on. So I have difficulty saying that merely because the board didn't approve, they didn't intend. And you said here in argument they didn't intend one way or the other because they didn't know about it. Yeah. But if you're trying to figure out intent of the board in terms of what it considers to be unjust, because it really is, and part of the unjust enrichment is, okay, does the board feel itself or does PMA feel itself to be harmed? I'm trying to figure out why it is irrelevant. And to come back to the question I've already asked and you've actually already answered, why it is irrelevant what the board did with what seems to me, on the same ground, unjust enrichment of the other employees. Maybe it wasn't quite so much money, but the plan was set up in breach of the fiduciary duties, a great deal of money was spent by PMA for the benefit of these employees, these employees got the money, and yet PMA has never gone after them for the recovery of what looks to me like an unjust enrichment on the same theory that this is an unjust enrichment. But Judge Fletcher, the difference is, first of all, may I just say as a general proposition, we contend that the intent of the parties, in this case, has to be measured by the writing. It doesn't matter what board members thought here, they didn't think anything, and it doesn't matter what the fiduciaries thought because they wrote it down, and under ERISA, unless there's an ambiguity, what people thought doesn't matter. It's what the plan says. So under the plan, the corporation was entitled, the association was entitled to this benefit. That's point one. Point two, the PMA has never expressed any disagreement with the fact, even though that was done without the board's approval, this plan does exist, and people got ordinary life insurance policy benefits under it. They were good benefits, and there's no challenge to that. The challenge is, and there was no challenge to cases where people retired and chose either to cancel or take over the key man piece of the plan. The only challenge, and it's the one in this case, is where somebody was terminally ill and His imminent death was more valuable. And if you just imagine, if any of us were on the board, and these sad facts were brought to our attention, that there was all of the facts about Mr. McMahon and his illness, and the question was, do you as board members vote to transfer a $9 million benefit without consideration to the family of a dying employee who was making $300,000 a year. So this is 27 times his annual compensation in return for getting nothing, just because out of sheer sympathy. I think that you would think long and hard before voting to do that. You'd have serious questions of a breach of your own fiduciary duty to the association and its members, any one of whom could sue you. And you would have further reservations if you were informed, as you would have been if you were well advised, that this would raise serious questions about their nonprofit status, because this would be excessive compensation to the employees. And you would have serious questions about the impact of doing that on the tax status of the plan. Let's hear from the other side, and we'll give you a chance to respond. Good morning, Your Honors. May it please the Court, Matthew Werdegar of Kecker and Van Est, on behalf of the appellee, Jeanette Coburn, and with me at council table is my partner, Steve Hirsch. Contrary to the arguments PMA has made on appeal, it is PMA and not Jeanette Coburn that is seeking to invoke equity to avoid the express terms of a valid contract. As we've been discussing this morning, the secured executive benefit plan at issue in this case was amended in 2002. And there's no dispute that Jeanette Coburn and PMA each received exactly what they were entitled to under the express terms of that amended plan. What's critical to keep in mind is that PMA sought to invalidate the 2002 amendment in the district court. It sought a declaratory relief action, as well as claims for rescission and reformation of the amendment. Each of those claims were denied, and Judge Ilston held the 2002 amendment to be valid. PMA has affirmatively stated that it is not challenging those rulings on appeal. So for purposes of PMA's appeal, the secured executive benefit plan as amended in 2002 is the operative contract. PMA has affirmatively waived any right to argue otherwise. Consequently, if PMA's claim on appeal is viewed through the lens of contract law, as their briefs say it should be, Coburn is unquestionably entitled to the benefits under the terms of the operative contract. But as the Court has noted this morning, PMA's only claim on appeal is not a contract claim, nor is it a claim for breach of fiduciary duty. It's an equitable claim for unjust enrichment. And properly treated as such, the question before this Court is whether equity requires, disregarding the expressed terms of the amended plan that the district court held to be valid and PMA has not appealed those rulings, and stripping Ms. Coburn of her late husband's death benefits. And equity requires no such thing. Without that amendment, what would she have received? Had, well, had the plan, the original plan been carried out, I believe she would have received what PMA ended up receiving. It was $980-some-odd thousand dollars, which was the premiums paid and an additional $162,000 on top of the premiums that had been paid. So that's what, under the original plan, that's what she would have received. Under the amended plan in 2002, PMA received all its premiums back, as well as an additional $162,000 on top of that. And she received almost $10 million. And she received the balance of the proceeds of the life insurance policies. That's correct. I mean, it was kind of flipped. It basically flipped. It was, the plan was what was called a reverse split dollar plan before, and it was converted into what is known in the insurance industry as a regular split dollar insurance plan. Didn't the district court say that when that was, the district court concluded that amendment may have been valid, but that they, the two principals here breached their fiduciary duty to the corporation? The, Judge Ilston did make that finding. She found that Tom McMahon and Joe Mineachi had breached their ERISA fiduciary duty in connection with the 2002 amendment. But it's important to recognize all the circumstances that Judge Ilston was looking at in connection with that ruling and in balancing the equities. Judge Ilston also expressly held that the amendment was not the product of fraud. So there was a, the wrongdoing that was found was a failure to notify a board that Judge Ilston found to be an inattentive and uninterested board. But there was a failure to notify. But the amendment was not the result of fraud. Joe Mineachi, who authorized the amendment himself, did not receive any benefit. And there's been no, there was no testimony at trial that any member of the board would not have approved the amendment had it been presented to them. Counsel for PMA hypothesized, you know, what would you think if you were on the board and this was presented? But those questions were asked at trial. And no member of the board who testified at trial said they would not have approved the amendment at the time. So all of these factors, plus the fact that the amendment was consistent with the intent of the plan, it was consistent with how every other participant had been treated upon their retirement or departure. Let me pick you up on consistent with the intent of the plan. And I understand that that's what Judge Ilston said. What do you mean by that? As I see the plan, there was nothing in the plan that said if somebody is about to die, we're going to flip and give to that person essentially a $10 million benefit or a $9 million change benefit. Now, that's what happened. I understand that. But how do I know that that was the intent of the plan rather than some general intent? Well, I guess there's three answers to that question, Your Honor. I think first I want to sort of reiterate that the operative contract is the 2002 amended plan, and that hasn't been appealed. But if you're looking at the original plan, within the four corners of the plan, that intent is not – it doesn't say this is what should happen, but – No. And, in fact, if you do what often is done, we infer in cases like this, from what is supposed to happen, what was supposed to happen is not what did happen. Correct? And there's nothing in the original plan that says, oh, if somebody is about to die, we're going to change it. That's why you needed an amendment. No, although it's clear from the materials that were prepared in connection with establishing the plan that the intention of the plan, both for tax reasons and because of PMA's philosophy and concerns about profiting from the death of an employee, that the way the plan was to operate and the way it did operate with every other participant was that upon their retirement or departure, PMA would relinquish its interests in the death benefits. And it's important to note that in doing so, the testimony at trial established that PMA never considered the health of a participant that was leaving, that they never considered the life expectancy. This was something that happened with each participant, and it wasn't that some determination was made, oh, they're healthy or, oh, they're sick. In retrospect, we know that no one died since then, but that wasn't something that was thought about at the time when these releases were executed. So they released their interest in the term life insurance policy upon retirement virtually automatically. That's right. And you want to say just as they released it in this case upon the expectation of death. That's correct. That's correct. And again, no one on the board testified at trial that they would not have approved this amendment had it been presented to them. And the amendment actually basically just accelerated changes that had to happen and did happen anyway. How many people from the board did testify? I believe there was at least four members of the board testified at trial, and it's in the record certainly, and I think it was either four or five that did testify. Out of how many? How many were on the board? I maybe need to defer to my PMA's counsel for the answer to that question. I believe the total number was in the neighborhood of eight. All right. Thank you. So when Judge Ilston was exercising her discretion with respect to the equitable principles, what factors did she really look at to strike the balance in favor? Mrs. Coburn. Well, she looked at, she found that PMA at trial had failed to establish two elements of the claim that it pled, which was an unjust enrichment claim. She found that they had failed to prove that Ms. Coburn's retention of her husband's death benefits was at PMA's expense. And, again, Ms. Coburn and PMA each received exactly what they were entitled to under the amended 2002 plan, the validity of which, again, is not at issue before this Court. And for its part, PMA was reimbursed, as I mentioned, for all of the premiums it had paid, and it actually received an extra $162,000. So there was no out-of-pocket loss whatsoever to PMA, and it received it. Counsel, I found that argument a little hard to accept because but for the fact that she received the $10 million, they would have gone to PMA. So even though they gained $136,000 or whatever it was, more than the premiums that they had paid in, they still were deprived of $10 million. That's assuming the original plan remained in effect, and that's assuming that PMA did not do what would have happened with every other participant, which was to relinquish its benefits or to have the board voting to allow the benefits to go to Ms. Coburn. But there's nothing on the face of the plan that requires them to do that, is there? There's nothing on the face of the original unamended plan that required that to occur. Or even allows it to occur. That is to say, they need the amendment before they can do it. Well, I don't think there's anything in the plan that prohibits a relinquishment of rights, which is what happened with every other participant. That was always available. So I don't think it was prohibited for them. I'd have to go back into the text of the plan, and I may have to do that if it becomes relevant. But my understanding is that the plan set up that they could relinquish upon retirement, but it did not set up they could relinquish prior to retirement. Am I wrong? Well, that may be correct, but Tom McMahon did retire before he passed away. He retired, it was a matter of a week or so before he passed away. But he formally retired from PMA. Well, then, but if it's allowed under the plan, why did they do the amendment? I believe the testimony at trial was that these were changes that were in the works anyway. The need. That's not my question. If it's allowed under the plan, that means you don't need an amendment. Why, then, did they do an amendment? I think the answer to that question is, well, I don't know that Joe Mignacci addressed that question in his testimony at the time. I know he testified that he had, he believed he had the authority to enact the amendment, and it was a change that had to happen anyway. I don't know if he had in his mind at the time that he made this decision that he could just relinquish without an amendment.  In answering your previous question, I was answering based on my own reading of the plan. So at the time, I think he understood, and his testimony reflected, that he had a duty to try and ensure that Tom McMahon was treated the way other participants had been treated and that PMA didn't want to profit from his death, and that he had the authority under the plan documents themselves to enact the amendment, which he did on behalf of PMA. Well, I'm looking at the excerpts of record, page 286, 7.2. The association reserves the right to amend the plan from time to time. However, the association shall not amend or otherwise take any action or fail to take any action which has the effect of retroactively changing or depriving a participant or his beneficiary of rights based on premium payments which have already been paid under the plan. And that's what the amendment did, it did not. I'm getting to the correct page, Your Honor. It's Article 7, Excerpts of Record 2, starting on 285, going to 286. This is the plan. Well, I think the couple answers to your question, Your Honor. First, again, the validity of the amendment is not at issue on appeal. PMA chose not to raise that issue on appeal. Your answer is it's waived, right? It is waived. Not only did they not raise it, they affirmatively said in their opening brief that they were not raising it.  So we're working with the amended plan. You're working with the amended plan. That's the operative contract. And the question before this Court is whether equity, the doctrines of unjust enrichment, require ignoring those expressed terms and stripping the benefits from Ms. Coburn. So returning to your question, but even if that were not so, even if this issue were, in fact, before this Court, 7.2 refers to changing or depriving a participant or his beneficiary of the rights based on the premium payments. PMA, under the terms of this plan, PMA was neither a participant nor a beneficiary. I mean, it was a beneficiary in the abstract sense, but it wasn't a beneficiary as the term beneficiary is defined in the plan. And that's something that Judge Ilston noted in her findings of fact and conclusions of law and struggling with the very idea that PMA could proceed under ERISA in this case as a corporate employer seeking to sue in the shoes of an ERISA beneficiary. And she concluded that because they had the opportunity to receive a benefit, they could, but they weren't a beneficiary under the defined terms in the plan. So I don't think that that provision prohibits the amendment that took place here, even if that were an issue before this Court. Well, go ahead, Judge Ilston. I just want to say the district court found the amendment was not necessary, was some of what Judge Fletcher was saying, because even under the original SEBP, the intent, the intent, again, was for plan participants to benefit and not for PMA to benefit. But she found that the amendment wasn't even necessary for this to happen. The intent was to benefit the plan participants, their beneficiary, not for PMA to benefit. She certainly concluded that that was the intent of the plan. I think that the concern of what happened here was the suddenness of Tom McMahon's illness. Had the plan, had he just lived a few weeks or months longer, I think the undisputed testimony was that this, by operation of the plan, this all would have happened anyway. But because of the suddenness of his illness, Joseph Mineachi believed he had to take some more affirmative action. But certainly Judge Ilston found the intent of the plan was that PMA was not to benefit from the death of an employee, and that's not what happened in any other participant's case, and that changes were made just a few months later that had to be made and were made to the plan that affected the exact same change that happened with the 2002 amendment. The plans that were put in place in 2003 provide for PMA senior executives, their family designated beneficiary to receive all the death benefits and not PMA, exactly the kind of change that happened here. I was going to ask, was there any other significant factor that Judge Ilston relied upon in striking the balance in favor of Ms. Colvin? Well, I think she relied upon a variety which we've touched upon, but she certainly noted the fact that Jeanette Coburn herself was not involved in the creation of the plan, was not involved in its amendment, and has never been accused of any wrongdoing. I think she certainly took note of the fact that the informal way in which PMA operated and the fact that its board was inattentive and uninterested to the point Judge Ilston found of being negligent and that just the way the informality certainly played into the significance of the conduct here and the fact that she concluded that the amendment, even if it was a technical breach of fiduciary duty, was not fraudulent. I think, and she also took into account, we've mentioned it, that it was consistent to changes that happened anyway and had to happen anyway a short time thereafter. And it's also reflected in her opinion that it's very strange, just as a gentleman, as a strange case in that PMA as a corporate entity is suing for ERISA benefits under ERISA. And it's not suing to return those benefits to the plan. This is not a traditional ERISA case where money has been taken out of a plan and they're trying to get it back in. The money never came from the plan. It didn't even come from PMA, and the plan no longer exists. So it's not suing to benefit an ERISA plan or any other participants or beneficiaries. It's suing just for its own enrichment. So in some, I see I've come to my stop point, but in some, Your Honor, it's the Judge Ilson's decision in this case certainly was not an abuse of discretion. She considered a mountain of evidence, carefully balanced the equities, and this Court should affirm. Thank you. Roberts. Thank you. Now, Mr. Faulk, we took you well over. Why don't we start out giving you three minutes in response and we'll see what happens.   I think I can do that. First of all, to answer the Court's question, there were, at the time of the amendment, there were nine directors. There were two who testified about. I'm sorry, I didn't hear you. Two directors of the nine testified about the amendment. No, two that testified about the amendment. Were those the only directors that testified at trial? There were two directors, others who were directors at the time it was set up, who testified. So they could have testified about this, but were not asked questions? I suppose so. Were you trial counsel? No, Mr. Baker and others were. But they were on the stand, right? So you had four directors on the stand? I think that's correct, or by deposition. Four directors testified, but two of those directors were not directors at the time. So it's two and two. Okay. Just to make sure that made it into the microphone. As I heard your court counsel say, four directors testified, two of them were directors at the time of the amendment. Okay. And two at the time of the initial setting up. Okay. But with respect, and this goes back to a question you asked, Mr. Werger, with respect to the intent of the plan, there is no, again, putting aside the fact that the board didn't know about it, even those who set it up, there is no evidence of any intent when you drill down to the specific level of what do we do if an employee is diagnosed with an illness or drops dead at his desk? At that point, if somebody died at their desk, the company would get the proceeds. There can't be any doubt about it. And if somebody is terminally ill, what would happen then? You'd have to go to the board with that. It would involve an enormous gift. And there is no evidence of anybody's intent that that's what was happening. The most you could say is that the people who set this up had in mind that when an employee retired and was healthy, the employee could at some point take over the term policy, pay the premiums himself and have some more term insurance, or he could let it go. That's the most you can wring out of this record. Consistent with that, of the people who retired, some just let the policy lapse. Others took it over and paid the premiums. And the most the company gave up was a couple of months of premium that had been prepaid. That's it. Well, no, it gave up, and I'm not specifying any particular employees or whatever, but obviously if an employee had been sick and it was a good bet to continue paying the premiums because it was a good bet the guy was going to die in a couple of years and they were going to get $10 million in premiums, they gave up a lot of money. But that didn't happen. Well, I understand, but they gave up. I mean, I gather we got testimony at trial, but they didn't inquire. They simply gave it up, irrespective of any health inquiry or whatever. They just didn't want to investigate that. So they gave up more than you just said. Now, they didn't give it up anywhere near as much as they gave up in this case. And they, Judge Fletcher, were the same officers who breached their fiduciary duty in the first place. If there was something wrong in failing to investigate, it wasn't the board. The board was never asked about these. It was the same officers, and they're the ones who they were taking care of each other. But, in fact, they didn't give up anything except for this. Excuse me, Judge. I just want to say, what is your response to the argument that the claim that the amended SEBP is the operating contract here as found by the district court? Well, the claim here is that under ERISA, the amendment was invalid and that as a result of a breach of ERISA, a constructive trust arises. I disagree with Mr. Werger. We haven't waived or abandoned that claim. We didn't appeal the rescission ruling, but we have appealed the core ruling that ERISA was violated by this amendment. So we definitely do not agree, Judge Nelson, that the amendment is the operative contract. If it were, we lose. But it's not. The amendment is itself a violation of ERISA. It stripped the company of $9 million of value without the approval of the board and, as Judge Hilston found, in breach of the fiduciary duties of those who did it. I understand your position. Thank you. Thank you very much. And I think I have been the beneficiary of generosity and a couple of extra minutes. Thank you. Yes, you have. Well, you've got your five, as it turns out. Thank you, both sides, for nice arguments. A tricky case. Pacific Maritime v. Coburn now submitted for decision. We'll take a 10-minute break.
judges: Nelson D. W., Fletcher W. , Paez